Field number 2007-1074, Schwarz Pharma v. Paddock Labs Good morning. Good morning. Schwarz Pharma submits to the district court below urgent granting summary judgments that prosecution history estoppel barred Schwarz Pharma from showing infringement by equivalence. The district court looked at somewhere around 13 to 15 pieces of prior art, at least art that predated the date of amendment, and concluded that that art showed that a person still in the art would have known that magnesium oxide was a stabilizer against cyclotation. That's our position. We submitted declarations from our experts that disputed the state of the art. But here's the question. Did you dispute what the district court found, or did you dispute the scope of what you thought we should look at versus the foreseeability? And what I mean by that is it seems like the whole issue boiled down to is this a known or foreseeable or interchangeable stabilizer in cyclotation or as an ACE inhibitor or just for pharmaceuticals? So that's – it seems to me that the dispute is not one of that, in fact, but is one of law because it's a matter of defining the boundaries. Some of the references Patek submitted, it seems to me, have nothing to do with cyclotation. For example, there's a 505 patent that concerns omeprazole. Magnesium oxide is used in that case as a pH buffer to prevent the acid from degrading the omeprazole. I don't see how that's relevant to whether magnesium oxide is a stabilizer against cyclotation. But that's exactly my question, I guess, is what – I think the question here seems to be more one of what we have to figure out or what the lower court would have to figure out is the correct parameters upon which it needs to be known to be interchangeable for. I agree with that. And if you look at both the claim that was amended and the narrow claim, in both cases the claim language doesn't merely require the excipient to be present in the formulation. It requires it to perform a specific function. It has to stabilize against cyclotation and discoloration. And if a person of skill in the art at the time of amendment looked at a reference and said, well, it's a stabilizer, it's a pH buffer, I just don't know what possible relevance that would have as a logical and scientific matter to whether it would stabilize against cyclotation. Wouldn't it be obvious for you at that point then to try and use that as a possible alternative? If the chemistry is completely different and the magnesium oxide stabilizes against cyclotation by engaging in some type of chemical reaction with the API, whereas in the omeprazole example it reacts in the basis of pH, if the mechanisms are completely different, I don't see why you would try. Similarly, there are approximately five references that were submitted by Paddock where magnesium oxide is used to chelate to an antibiotic. And in one of the references it says it's specifically put in to make the antibiotic more soluble in an oral antibiotic solution. Again, Schwarzschild, what does that have to do with whether or not magnesium oxide would stabilize against cyclotation? In fact, the one thing that's undisputed in the record below is that Paddock does not have a single piece of art that predates the date of amendment that states explicitly that magnesium oxide stabilizes against cyclotation. The best that they have is... But wasn't it known to be a stabilizer of pharmaceuticals? A stabilizer of what? Of pharmaceuticals, instead of degradation. What difference does the mechanism have? Well, the claim language specifically requires that it stabilize against cyclotation and discoloration. Both the original claim language said a metal-containing stabilizer to inhibit cyclotation and discoloration. And the narrow language said an alkaline or alkaline or alkyl carbonate to stabilize against cyclotation and discoloration. And the district courts that have construed the claim have specifically said that to show infringement, you have to show that that excipient performs that function. But for foreseeability purposes, we're trying to figure out, or they're trying to figure out, would it be foreseeable? And it seems to me that the foreseeability analysis, and maybe I'm wrong, I'm thinking through this for the first time, should it be limited to the exact, specific, minute purpose for which you argue or you assert in the claim? Or should the foreseeability be sort of a slightly broader concept? If you look at the example of the ACE inhibitors, you're trying to prevent certain chemical reactions. Perhaps if you had magnesium dioxide used in a reference where it's involved in that type of activity, it would be relevant. But if you go out where it's in an oral solution, where it's chelating in the magnesium divalent ion to somehow make the antibiotic more soluble, it's just so completely different. I just don't see why that would be relevant to the foreseeability inquiry. The Japanese references that Paddock relies upon, there's, again, no mention expressly of cyclization. They put in an affidavit from their expert who said that, looking at the reference today, I believe that the degradation mechanism would be cyclization. We submitted declarations from both of our experts stating that they thought that was the work of hindsight and that someone still in the art of the time would not have understood that to be cyclization. In our view, on summary judgment, that should have been the end of Paddock's motion. And the district court seemed to accept Paddock's interpretation of the references. The 9-1-9 patent is another reference Paddock relied upon. Again, there's no mention of cyclization anywhere in the reference. There's not even a mention of any degradation product. So, again, if your goal is to stabilize against certain types of degradation in the reference, the 9-1-9 patent, says nothing about it, doesn't mention any degradation product, we don't see how it would render magnesium oxide foreseeable. Wouldn't magnesium oxide fall within the original claim scope, metal containing stabilizer? How is it that you argue it doesn't? Because I took it from your brief, you argued it didn't, but I found that a little difficult. Sure. We argued that if you look at the specification in this case, it says specifically that borates, silicates, and carbonates are contemplated. Based on that language, we believe someone... The next sentence follows and says, borates, silicates, and carbonates are contemplated. Have they disclaimed everything else that would qualify? Because, you know, that's what we require, right? We're supposed to construe claims given its, you know, ordinary meaning to one skilled in the art. You wouldn't assert the ordinary meaning to one skilled in the art for metal containing stabilizers as just those. In the abstract, stripped away from the specification. I don't dispute that. No, and you wouldn't say the specification is strong enough to amount to a prosecutor, a specification form of disclaimer, would you? I might. You might. I think we argued below, we've argued in our brief, that the language contemplated connotates that those are the only things thought of by the inventor. The claims were never just rejected under 112. Looking at those two things in common, we think it's a reasonable reading of the specification and the failure of a 112 rejection that that's the only thing that Tim was understood to mean. The 112 issue is a totally separate, distinct one from whether or not you're suggesting that by saying he contemplated these three things, he had therefore disclaimed everything else that would be within the ordinary interpretation of words. I agree. I figured you would eventually. If all exilitates and condenates are contemplated, then why did you have an original claim to metal stabilizers? You obviously intended more than that, so you gave it up and surrendered that. If that's true and there wasn't an item of amendment, you still get into the issue as to whether magnesium oxide was foreseeable. So if you disagree with our interpretation of the specification on that issue, we still submit that there was an issue of fact that was decided on a summary judgment that should not have been. Indication can be amended for that reason. Is it your view, then, that necessarily the issue of foreseeability is factual in nature? In this particular issue, as to what the state of the art was at the time of the amendment, were there competing views of the experts as to what that disclosed to a person of skill in the art? I think that issue is factual in nature. As to whether the ultimate question of foreseeability is a question of law, it seems to me is a separate issue. I don't see why there wasn't time-based stoppage. Because, in remarks, the African said, the combination of the two necessary ingredients demonstrates the patentability of the present invention. This is especially so since the above amendment focuses clearly on the use of alkali or alkaline earth and metal carbonate. In other words, we're emphasizing the reasons of patentability for the invention of carbonate. I mean, Paddock argued that below, and we pointed out the Federal Circuit cases that Paddock was relying upon. There had been not only some statement about the claim element and its usefulness in the invention, there had also been a specific statement that other things won't work. And the District Court, we believe, properly concluded that there's nothing like that in the prosecution history here. But basically, this says, this is my invention, and this is why it's patentable. It doesn't disclaim equivalence, or it doesn't say this is the only thing that will work in the invention. In the prosecution argument-based stoppage case decided by Paddock, there are those types of clear statements that if you don't use the claim element, it's not going to work. Aside from analogies drawn to the facts of pressings, why doesn't the public notice function of claims and specifications strongly push in favor of the reading that is being articulated by Judge Brewer, that other things are deliberately being suggested to fall outside the scope of the claims? I don't think the statement is a clear enough disavowal for someone to interpret it as saying that if you use anything but this, it will never work in the claim invention. Well, it's not a question of whether it will never work. It's a question of whether I, the applicant, am trying to include it or am willing to exclude it. Applicants are allowed to exclude things that may still work, but they don't care to claim them for whatever reason. Certainly, it was intended to tell the examiner what the claims meant. The emphasis to the examiner during the prosecution was to emphasize this combination of the saccharide and the alkaline amylocarbonate that stayed alive. But I don't think the statement is clear enough to be read as an estoppel against any equivalence. So it's supposed to be clear enough to get allowance by having the examiner focus only on those things, but not clear enough to ever trap the applicant later. That doesn't seem like a very fair standing. Well, I think all arguments made to the examiner tended to convince the examiner to issue the claims, but that doesn't mean every statement— That's why they should bind the applicant thereafter, because they were provided for an important reason, and the applicant shouldn't be able to walk away from them later. Counsel, do those arguments focus on magnesium carbonate? I want to make sure I'm keeping up here. Is that what those arguments focus on, right? Magnesium carbonate? The arguments made during the amendment of the claims focus on the use of an alkaline and alkaline amylocarbonate in combination with the saccharide to prevent hydrolysis with respect to the saccharide, and then cyclization and discoloration with respect to the alkaline and alkaline amylocarbonate. So the issue of magnesium oxide, magnesium carbonate, never really was an issue. You agree that those statements raise some sort of prosecution history problem for you, but maybe they just don't reach to oxide. I'm trying to make sure I understand your argument. We don't think the statements in the prosecution constitute any type of estoppel, and that they're not a clear disavowal of any potential equivalent. Or even if they did constitute some sort of estoppel— It certainly doesn't extend. —it wouldn't necessarily extend to oxide. Magnesium oxide, correct. That's what you're saying. It doesn't mention oxide anywhere in there. The issue of magnesium oxide never came up. There was no prior article in the examiner that came up that involved an oxide that you were distinguishing around. No, that's absolutely right. I want to make sure I'm understanding. That's absolutely right. There was no issue in the prior article before the examiner about the use of any excipient to stabilize against cyclization and discoloration. No reference before the examiner, and nothing to do with the stability of HX. Doesn't that rule that you're suggesting lead to the circumstance where if I give up much more than I needed to give up, in view of all the examiner had said, that the excess I give up I can later recapture by saying it wasn't really an issue in front of the examiner. He didn't care. I gave it up, but he didn't care, so now I should be able to get it back. The rule of what? Amendment-based estoppel? The rule that you are suggesting would allow somebody to recapture something even if it was very clearly given up, as long as that was not a big issue in the eyes of the examiner at the time. All I'm saying is that the statements made to secure allowance of the pack we submit were not clear disavowals of any equivalence. And as a matter of fact, there just was no issue about whether magnesium oxide... What's the connection between your first statement and the second one? I was responding to a question with respect to the second one, and I said that magnesium oxide was not an issue during the prosecution. But that's not the reason that you shouldn't be held to have surrendered. The statements made during the prosecution do not constitute a clear disavowal of any equivalence. Thank you. All right. Thank you, Mr. Fink. Good morning. May it please the Court. I'll try to address the points that the panel raised during Mr. Malone's argument and address a few of my own. The first point regarding deciding boundaries of what the test of perceivability is. We agree that is a legal issue, and I think that pinpoints what the dispute is. We believe that the district court properly found that, following the first PESTO case and CLAXO, that it's a known stabilizer for pharmaceutical formulations. That's what you need to determine for perceivability. That's what I understand the issue is. But here's my question. Is the identification of what it has to be a known stabilizer for, whether it's sickleization, as they argue, or pharmaceuticals, as you argue, is that itself a question of law or fact? It would be a question of law. There's always underlying facts, but the ultimate determination of the question is law. Why? Because it goes to—I'm not saying the ultimate determination of perceivability. I'm saying the ultimate determination of the scope of what you should look at to determine if it's perceivable. Why? Is that a claim construction argument? What is it about that that makes you— It's similar in the sense of prosecution. Mr. Estapol and looking at the prior art, you have to determine what it is. But in this case, there is no genuinition dispute as to what the prior art shows. Plaintiff's expert—and we've quoted it repeatedly in our briefs—said, I mean, in my opinion, magnesium oxide—I mean, you provided 18 references where magnesium oxide is used to act as a stabilizer in certain compositions and certain drugs. So it was known. I don't see them disputing that it's known in pharmaceutical compounds generally or maybe even for degradation. Maybe they don't dispute that. I think that the dispute here focuses on what should be—it has to be known for. Does it have to be known just for use in pharmaceuticals or does it have to be known for use as a stabilizer against stigmatization? And that's really what the dispute is all about here. So if you could focus me on that, why it is I should agree with you, it should—perceivability ought to be looked at through this broader lens of pharmaceutical compounds in general rather than the actual claim purpose. Well, we're not trying to invalidate the claim at this point. It's not obvious it's determination or whatnot. So you don't have to go to the specific, specific claim language. What the case law has consistently held is, is it—is the equivalent known in the prior art and the field of the invention? And the field of this invention is state-wise compositions. You're saying it doesn't have to be known to inhibit cyclization and discoloration even though they're recited in the claims? Actually, that's only in Claim 1. It's not in Claim 16. But I'm saying yes or no, it does not. Certainly it's in Claim 16. It's a process for stabilizing against cyclization. Yes, but there's no discoloration in that claim. So would you suggest—oh, I'm sorry. Go ahead. Would you suggest—I mean, because I think that you used some language that I'm familiar with when you said field of invention, and it suddenly brought to mind for me the analogous arts idea, right? Reasonably pertinent to the problem the inventor is trying to solve in the same field of endeavor. Do you think that that's a test that would help me inform my thinking about what the breadth of the foreseeability ought to be? I think the breadth of foreseeability is very broad. And remember, it's plaintiff's burden to show that they did not surrender something. So they have to show that when there is a presumption of surrender, which we have in this case, they did not surrender a specific magnesium oxide. If you look at the specification, it says alkali and alkaline earth metal salts are operable. That is a specific definition. Magnesium oxide, by definition, is an alkali or alkaline earth metal salt. The original claims—they only discussed Claim 1. 2 and 18 specifically require an alkali or alkaline earth metal salt. To obtain allowance of the claims, they amended salt to carbonate. Magnesium oxide is indisputably an alkaline earth metal salt. It is indisputably not an alkaline or alkaline earth metal carbonate. But a lot of things would have been contained within those original definitions, right? It's not—you know, I've got my periodic table up here, and I'm no whiz with it, but at the same time, it could have encompassed thousands of different combinations, the original definition, the original claim language that they used, right? So it's not just that it encompassed magnesium oxide and magnesium carbonate, and therefore we should say it's foreseeable. No, but the specification said alkali and alkaline earth metal salts were operable. That saying, this field, this broad field— Does that tell us anything about the anion, then, that ought to be used? A salt? Does it tell us that it has to be—you know, I'm just trying to understand. If you go further down, it says any anion, as long as it does not have a deleterious effect on the formulation, which if there was going to be evidence to prevent it, and there wasn't, would have been plaintiff's burden to raise. They did not establish—they did not carry their burden to show, to rebut the presumption of the prosecution history of Stockwell. They did not rebut the presumption that it was foreseeable— well, excuse me, it's not—that it was foreseeable. What about the point that we seem to have, in Mr. Malone's view, adamant experts as to issues relating directly to foreseeability, and therefore we should have a trial? Maybe you'll win at the trial, maybe you won't, but the trial rather than summary judgment would be the proper vehicle. Summary judgment is a proper vehicle, and there are no genuine issues of material dispute. We have that here. We have their experts conceding that magnesium oxide was a non-stabilizer in view of all the prior argument disclosed. Moreover, which is an issue specific to this case, it would be unjust to hold that it was not foreseeable because the inventors, prior to the time of the amendment, had conducted stabilization experiments using magnesium oxide and ACE inhibitors. That shows two things. One, it's clearly foreseeable because they were doing it, and two, they knew what they were giving up. Are all ACE inhibitors capable of cyclization? In other words, do they have those structural features in common? I don't know, Your Honor. However, the one that they were testing— I believe the Lanaproof does. They were testing Quinaproof, and it is subject to cyclization, as is Boexapro, which is the subject of this litigation. But they knew. They had that information way prior to the time of the amendment, and it would be unjust that they are experimenting. It's foreseeable to them, and then to permit them to come back and say, no, it wasn't foreseeable. It's not right. Of course, that's not prior art. It isn't prior art, but the question is, if the inventor was foreseeable to the inventors, it's a strong indication that it would have been foreseeable to those of skill in the art as well. Not necessarily right because it's foreseeable to the— have we ever said that in a case? Because it doesn't really make sense to me. The inventors are apparently on the cutting edge of this, right? They got a patent for something new, novel, different, that no one else thought of. So the idea that something might be foreseeable to them doesn't jump me to the legal conclusion you just made, which is therefore it's foreseeable to everyone else in the field. It shows exactly that they knew what they were giving up. But I'm focusing in on what you said. You said it's foreseeable to the inventors. It's foreseeable to everyone else. I think in light of the specification, when they say all alkaline earth metals salts are operable, and they're claiming the specific salt that they claim is not foreseeable, that is a factor that must be weighed in determination. The district courts have found it very interesting what the inventors were doing, but it's irrelevant. And we believe that it is relevant to this inquiry. And it should be a factor that is used in determining foreseeability. Should what the field of invention is be a fact component of this? Because you said that it has to be foreseeable in the field of invention. Well, the title of the patent is stabilized compositions. I think that's pretty much the field of the invention. It's much broader than the specific claim that they are ultimately allowed. Is it a fact question, the field of invention? I don't think so. I think it would probably be a claim to the invention. Just like prosecution history, estoppel, those are all legal issues. Of course, there's underlying facts, but ultimately they can be decided by a court properly on summary judgment. I'd like to turn next to the argument based estoppel. I see a lot more questions on this issue. In a case that came down since we filed our brief, it's the Pollock's case. And in that case, this court basically found argument based prosecution history estoppel, where arguments made to the examiner to obtain allowance of the claims regarding a claim term were made. Now, there was no clear disavowal, but what the court said that a competitor would reasonably believe that Pollock had surrendered any claim to a frame that was not rectangular. Well, what's the point of this argument that you're making? Are you suggesting that if we disagree with your first argument, that we can affirm the judgment on the basis of the argument you're now making? Well, we raised argument based estoppel below. The district court basically said that there was no clear disavowal. We believe there is. The prosecution history says what it says. The three keys are it was necessary. What I'm trying to understand is whether this is a fallback argument, if you disagree with your first argument. Oh, it's a separate argument. We're asking that the judgment be affirmed on the grounds of both amendment based estoppel and argument based estoppel. The district court found amendment based estoppel did not find argument based estoppel. We believe the district court erred when it did not find argument based estoppel. We believe the Potts case is even closer to our situation, and that's why I brought it to the attention of the court. But when the applicants to obtain allowance of their claims argued it was necessary, the claims now clearly focus on carbonate as the invention. And moreover, when you don't use carbonate, it doesn't work. We get the degradation products. I think it's a clear disavowal. What does it say when you don't use carbonate? It says the results dramatically indicate that the absence of an alkali or earth metal carbonate causes considerable amount of cyclization to form a large amount of diaketopiprazine, an undesirable byproduct. Where is this? It's in the file history. My site is the appendix, page 377. It's in the same paragraph where they argue that it's necessary and that the claims clearly focus on carbonate. Are we going to reach a standing question that you also raised? Is that still before us? Yes. Okay. Are you going to get to that or not? I don't want to distract you from the current course of argument if you have more to go there. I do want to address two of the other issues that you brought up, the public's notice function of claims. Any patent practitioner, one of our ex-filmmakers, reading this file history, would know that everything other than carbonate, all alkali and alkali earth metal salts, which was originally claimed, had been given up, had been surrendered, when they narrowed their claim to carbonate and specifically argued the patentability and necessity of carbonate. And the specification itself tells you it was foreseeable because all alkali earth metal salts worked. So in light of what they disclosed and then subsequently claimed, it's clear they knew what they were giving up, it was foreseeable. And so this is a specific definition, an alkali or alkali earth metal salt. You know whether a chemical compound is or is not such a salt. I found in the prosecution history that last statement you read to us, and it just helped me understand the technology. It says, Example D shows the effect when a saccharide is absent. And then after that is what you read to us. The results dramatically indicate the absence of an alkali or alkali earth metal carbonate causes considerable amount of cyclization to form. And it goes on to say, Example D clearly demonstrates in the absence of a saccharide an increased amount of hydrolysis occurs. Are they focusing in on the carbonate part here? This is an argument based estoppel. I just don't know what a saccharide is. So I'm hoping you're going to tell me. Is that an alternative to a carbonate? What is that? The claims require both an alkali earth metal carbonate and a saccharide. The purported invention is that the carbonate inhibits certain types of degradation and the saccharide inhibits another type. So they're performing two separate functions. So when they say the alkali or alkali earth metal carbonate, they're not distinguishing. What is it you're telling me that statement means in that context? I'm saying that it is necessary. If you don't have the carbonate, you're going to get the degradation byproduct, which is the subject of the invention when it's trying to avoid. And they're saying without the carbonate, it doesn't work. It's necessary. The claims clearly focus on that. All right. Thank you. Mr. Malone. Two minutes. I just want to go back to this issue as to whether it's stabilization in general or stabilization of encyclization, discoloration, and whether that's an issue of law or fact. I just don't see how it could be an issue of law and that the court could fashion some type of legal rule that would say that you don't have to take into consideration what the claim language is. You don't have to take into context of the invention but just some flat-out rule that applies in all types of pharmaceutical cases. It seems to me that it's a question that necessarily requires an examination of what the claim language is and then what the technology is and whether the technology that's being looked to for other stabilizers would be considered by one of the skill in the art as a scientific matter to be relevant. So that seems to be an issue of fact, not law. Let me make sure I understand your argument. Your argument is what the field of invention is for the purpose of foreseeability is one of the underlying fact findings. We've acknowledged certainly there are lots of fact findings incident to the determination of foreseeability and the scope of what the field of invention is, what we should be looking at to see if it's foreseeable is a question of fact. Exactly. I think you're right under the analogous arts idea anyway and that's why I'm wondering if it applies here. In the context of obviousness determining two references or analogous arts, Henry Paulson says that the determination of the field of invention is a question of fact. And so that's why I'm trying to figure out if that's the same way to look at this. I think it is. I think it's the only way that makes logical sense and that at the end of the day it's an issue as to whether the invention, if it's the subject of the suit, in the prior art that's being talked about for foreseeability purposes is something that one of the skill in the art would, as a matter of science, consider relevant. So it seems to me it has to be an issue of fact. That's the only point I have. Thank you. Thank you both. We'll take the case under revising.